copy of the MIRF is attached hereto as Exhibit G. Relator Strunck was specifically directed by Ed Hardin that he (and all other sales specialists) should proactively encourage every doctor he called on to sign a MIRF requesting information on the five-day course of treatment with H.P. Acthar Gel, whether or not the doctor initiated any discussion of the subject. Defendant used the MIRF as a pretext and for "cover" in that the sales force had already been directed to and in fact, had already discussed the "Brod Plan."

140.    Thus, at the direction of management and as a matter of course, Sales Representatives prepared and submitted MIRFs requesting such information for every doctor they called on. Relators then received copies of the responsive materials that Questcor sent to the "requesting" doctors. Those materials explicitly promoted the so-called five-day "Brod Protocol" with H.P. Acthar Gel as being equally as effective as therapy with intravenous Solu Medrol, even though there was no clinically rigorous data to support that claim.

141.    Several doctors, including Drs. Leonard Pickard and Mustafa Kahn (Kingston, NY), challenged the Brod Protocol as being thinly supported and not persuasive, and they refused to prescribe H.P. Acthar Gel at all. But others were persuaded by this misleading promotion. Among the doctors who started prescribing the five-day course of therapy with H.P. Acthar Gel upon receipt of a "response" to one of these MIRFs were Dr. Alice Rusk (Stamford/Greenwich, CT) and Dr. Nilay Shah (Mt. Kisco, NY).

E.   Questcor Illegally Uses Medical Science Liaisons
to Promote Off Label Uses of H.P. Acthar Gel.

142.   Another tactic employed by Questcor to promote H.P. Acthar Gel off-label is to use its Medical Science Liaisons ("MSLs") as an end-run around sales representatives' duty to lawfully promote the drug. Questcor's use of MSLs in this manner is a way for the company to make the unlawful promotional activities for H.P. Acthar Gel appear lawful. *See e.g. 21 C.F.R. 99.101 et seq.*

143.   Medical Science Liaisons are supposed to talk with physicians only about science-to-science issues, and only when those discussions are initiated by the physician. Their primary role is to engage in non-promotional medical activities, and they are not supposed to engage in product promotion. Thus, a sales representative is not permitted to use an MSL as a conduit through which to initiate and pursue off-label promotional activities with physicians.

144.   The law notwithstanding, Questcor erects no wall between its medical and sales staffs, and actively encourages its MSLs to probatively participate in promotional activities. Medical Science Liaisons routinely accompany Questcor sales representatives on their sales calls.

145.   Questcor encourages its sales representatives to probatively partner with MSLs to increase H.P. Acthar Gel sales growth. Commonly, the sales representative will initiate an off label discussion, and then the MSL will complete the discussion. On other occasions, sales representatives ask their MSL colleagues to contact physicians who are reluctant to prescribe H.P. Acthar Gel for off-label uses in order to attempt to

-59-

overcome that reluctance whether or not the physician initiated the off label discussion or requested further information. Again, Questcor ignores that MSLs are not permitted to engage in promotional activities.

### F. Five Day Course of Treatment Was Ineffective and Harmful to Patients

146.   Many physicians have rightly rejected Questcor's efforts because the 5-day protocol is not supported by any credible evidence, and because experimenting with it cannot be justified in light of its cost and potential for patient harm. However, many physicians have been persuaded to switch from Solu-Medrol to a 5-day course of treatment with H.P. Acthar Gel - in large measure due to the valuable inducements provided to them by Questcor, as described herein.

147.   In Relator Strunck's experience, approximately half the doctors he persuaded to prescribe H.P. Acthar Gel for a five-day course of treatment had to order repeat prescriptions in as few as two to three months due to patient relapse, even though patients treated with Solu-Medrol typically relapse only after twelve to eighteen months. Relator Strunck knows this issue was widespread, because it was regularly was discussed during regional sales team conference calls. In Relator Pratta's experience, she experienced the same reactions from patients who doctors used the 5 day course of treatment.

148.   Questcor's decision to promote H.P. Acthar Gel only for a five-day course of treatment came at the detriment of patients and patient safety. The issue was routinely discussed during regional sales calls and national sales meeting, Questcor knew that although a typical patient treated with Solu-Medrol for five days would

relapse in twelve to eighteen months, and that a typical patient treated with H.P. Acthar Gel would relapse in as few as two to three months.

149.   Thus, the cost to treat a typical patient with Solu-Medrol would be less than $5,000 over a five year period (approximately four treatment cycles), but the cost to treat the same patient with H.P. Acthar Gel would be almost $700,000 (approximately 30 treatment cycles). As an example, at the Regional Sales Meetings on March 7th- 8th in 2013, held in New Brunswick, New Jersey Blainy Creasy, the region's new Medical Science Liason (MSL) gave a scientific talk about Acthar and its new mechanism of action (MOA) and how they intend to position it in the physician's offices. Stacy Clancy said that *"even though we sell 5 day, the doc's are finding out that it is not working and some patients need another vial."*

150.   Plainly, promoting a five-day course of treatment with H.P. Acthar Gel inured to the patient's financial detriment and, more importantly, to the detriment of the patient's health and well-being. Questcor promoted the five-day treatment cycle in order to get both the physician and the patient "hooked" on the substantially more expensive H.P. Acthar Gel in lieu of Solu medrol.

X.   **Questcor Pays Illegal Kickbacks to Induce Providers to Promote and Prescribe H.P. Acthar Gel for the Five Day Dosing and Pulse Therapy**

A.   **Questcor Disguises its Kickbacks and Off Label Promotion of H.P. Acthar Gel Through its Engagement of Paid Speakers.**

-61-

151.   Questcor knows that under FDA laws and regulations it is not permitted to initiate discussion of off-label uses of H.P. Acthar Gel, or to promote false and misleading comparisons of H.P. Acthar Gel to other drugs. Nevertheless, a key component of Questcor's Fraudulent Marketing Scheme is the use of paid "experts" to influence other doctors to prescribe H.P. Acthar Gel for their patients, including for off-label uses, and to influence patient decision making as well.

152.   Thus, Questcor routinely pays preferred doctors and other healthcare providers to make presentations to individual or small groups of doctors in order to encourage them to prescribe H.P. Acthar Gel, or to individual patients. Questcor's Executive Vice President and Chief Business Officer, Steve Cant, explained the program, and confirmed its success in promoting sales, during the company's Q1 2011 earnings call:

> In these [sponsored physician speaker programs], existing Acthar prescribers present to small groups of physicians, their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses. When combined with follow-up sales calls, these programs appear to be a key driver of our sales growth. Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future. As [CEO] Don [Bailey] mentioned, we believe that we still have a lot of work to do and a lot of room to grow in the MS market. Our number of Acthar prescribers is growing, but at roughly 500 it's still just a small fraction of the roughly 4,000 neurologists in the US currently being called on by our sales force.

153.   In all instances, the speakers are paid to promote only a five-day course of treatment (as opposed to the much longer and even more expensive course of

treatment specified by the FDA) and to make false and misleading superiority claims with respect to Solu-Medrol.  As an example, on March 15, 2013 Relator Pratta had a dinner program for physicians in which Dr. Papa-Rugino was the speaker. She openly promoted Acthar off label and when she got to the dosing slide, she said that *"the dose is a five day dose."*

154.  Questcor chooses its speakers based on their enthusiasm and track record for prescribing the five day course of treatment. Thus, before a doctor will be considered for Questcor's speaker program, he or she must prescribe H.P. Acthar Gel for at least five patients who then actually take delivery of the drug and undergo a course of treatment with it. Questcor then pays the doctor to give promotional talks to physicians and prospective patients. Sumul Raval, M.D[14] is a Doctor in Lisa Pratta's territory who is now prescribing Achtar.  On March 7, 2014, John Stabile directed Lisa Pratta to go see  Dr. Raval and *"give him more talks so he will give us more referrals. A referral for each talk."*

155.  Questcor recruits physician assistants and nurses to become paid speakers for H.P. Acthar Gel if they have the ability to influence a large volume of prescriptions. Thus, for example, Relator Strunck was encouraged by Regional Manager Ken Miller to recruit Nicole Buonanno to be a paid speaker. Ms. Buonanno is a physician assistant for Dr. Misha Kucherov (Poughkeepsie, NY), and she has

---

[14]  On February  24th Dr. Raval gave a patient program talk. When it came to dosing he stated, *"the dose of Achtar is 5 days.  Everyone only uses it for 5 days".*  Dr Raval was speaking from the materials but also ad libbed. The speaking opportunities he has received are tied to referrals. He typically puts in a referral either right before or after he speaks.

primary responsibility for treating Dr. Kucherov's patients who suffer from MS. Mr. Miller told Relator Strunck that if he could confirm Ms. Buonanno as a paid speaker, she would put all of Dr. Kucherov's (approximately 200) MS patients on H.P. Acthar Gel. To her credit, Ms. Buonanno declined Questcor's proposal because she was not persuaded that H.P. Acthar Gel is an equally effective or superior therapy for acute exacerbations of MS.

156.    Questcor speaker programs were and may still be are coordinated through a third-party vendor called MedLogix, (and possibly others). Questcor pays for three different types of speaker presentations: (i) Health Care Provider speaker programs; (ii) Meet-the-Expert speaker programs; and (iii) Live Patient speaker programs. Although the presentations are offered under the guise of providing "fair and balanced" information, they are nothing of the sort. Speakers are selected based on the volume of H.P. Acthar Gel prescriptions they write, and the extent to which they will be strong advocates for prescribing H.P. Acthar Gel for a five-day protocol.

157.    Paying doctors to give these off-label promotional presentations to peers and patients is a common and broadly-accepted sales practice at Questcor because the primary focus is on growing market share at all costs. Not coincidentally, most doctors who agree to prescribe H.P. Acthar Gel are rewarded with speaker training and dollars. Attached hereto as Exhibit L is an extensive list of "speakers" trained on H.P. Achtar Gel.

158.    In 2014 Questcor began removing people from the speaker list based on the frequency of referrals made by the Physician so that they can create "space." As an

example, in Lisa Pratta's Region, her Manager, John Stabile looked at how many referrals the speaker's have written in the year and also how many times the doctor was used for Health Care Provider and Patient programs.  Stabile asked Pratta directly if he could make Dr. PapaRugino inactive, because *"she has not put in many referrals this year"* and not been used that much. See the text message from Stabile to Lisa regarding *"cleaning up the database"* (that demonstrates such conversations took place) which is attached hereto as Exhibit M repeated below:.

> Thank u for your help today
> Hey Lis··· Do you think it would be OK
> to deactivate Papa-Rugino from the
> ~ speaker bureau, at least for a while?
> We are at our company cap and can't
> add new speakers until we clean up
> the database. She's only been used
> once in a year for a patient program
> and 0 HCP programs. Let me know,
> thanks!  Let me think about it. I am seeing
> her tomorrow and she has come around
> this past quarter.

### 1. *Health Care Provider Speaker Programs*

159.    Health Care Provider ("HCP") speaker programs typically occur over dinner (sometimes called "Dine-Around" programs) at fancy restaurants (e.g. "42" at the Ritz-Carlton Westchester, NY) or during a catered lunch at a physician's office, and they involve a single paid speaker who proactively promotes the five-day Brod Protocol to the physicians who attend. The threshold for what will qualify as a reimbursable

speaker program is very low: only three people need attend (and they need not be physicians). Even spouses are permitted to attend these events.

160.   Questcor imposes no limit on how much its sales force may spend on these meals, and instead encourages the sales force to spend as much as possible on the theory that a lavish meal will induce favorable script writing. During his tenure with Questcor, Relator Strunck spent approximately $5,000 per month on catered lunches, and $2,500 to $4,000 per month for dinners and speaker honoraria, all reimbursed by Questcor with the approval of his regional manager.

### 2.  Meet-the-Expert Speaker Programs

161.   Meet-the-Expert speaker programs tend to be one-on-one promotions geared toward specific doctors and practices. These programs typically occur by (i) telephone (such as when the Questcor sales specialist will call the speaker from a sales target's office, and ask the speaker to promote directly to the target), (ii) by video (such as when the Questcor sales specialist will play a promotional presentation in DVD format for the sales target, who necessarily cannot ask any questions of the speaker), or (iii) in one-on-one presentations over a meal. In each case, the speaker is paid to proactively promote the five-day Brod Protocol as being superior to Solu-Medrol. Dr. Brod himself participates as a paid speaker during some of these interactions, both live and via DVD.

162.   Drs. Alice Rusk and Walter Camp (Stamford/Greenwich, CT) prescribed a five day course of treatment with H.P. Acthar Gel for at least two patients after

having been entertained with monthly lunches and a "meet-the-expert" DVD presented by Dr. Brod.

### 3. Live Patient Speaker Programs

163.   Live Patient speaker programs are events at which physicians are paid to speak directly to groups of patients, typically at a commercial venue (such as a hotel) with a meal provided.  The purpose of these programs is to encourage patients to ask their doctors to treat them with the five-day Brod Protocol, and thus only physicians who prescribe H.P. Acthar Gel according to that protocol themselves are selected for these programs.

164.   Questcor has designed a series of promotional materials, including paper materials and DVD presentations, that it encourages sales specialists to distribute at Live Patient programs. These materials include: (i) an "Injection Guide with Injection DVD"; (ii) a "Select Acthar for Select Patients" DVD; (iii) an "HITS Patient Flashcard"; (iv) a "Patient Waiting Room Checklist"; and (v) water bottles and tote bags that include the H.P. Acthar Gel logo.

165.   The launch materials for Questcor's Live Patient speaker programs confirm that their purpose is to promote sales and generate a return on investment ("ROI"). Indeed, a training slide deck for a July 25, 2011 training program identifies the following "Strategies for Success":

- Partnering to drive attendance
- Advocacy groups
- Physician offices/MS centers/Hospitals

· Targeting appropriate areas to ensure pull through

· Adequate pool of Acthar writers

· Pool of very patient influenced HCPs [emphasis in original]

· Ensure effective follow up to record ROI

· Good planning is critical for success

> **B. Questcor Pays Illegal Kickbacks to Physicians in Order to Induce Them to Promote and Prescribe H.P. Acthar Gel.**

166.    Questcor knows that it may not directly pay doctors for their decision to promote or prescribe H.P. Acthar Gel. Nevertheless, Questcor routinely induces doctors to promote and prescribe H.P. Acthar Gel by providing them with things of value as a quid pro quo for their support. Specifically, Questcor routinely induced doctors to promote and prescribe H.P. Acthar Gel by

(i)      bribing doctors' (junkets, gifts, etc) and their staff to prescribe and promote H.P. Acthar Gel;

(ii)     funneling research dollars to physicians who agree to promote and prescribe H.P. Acthar Gel;

(iii)    providing exorbitant speaker fees to doctors who become vocal advocates for H.P. Acthar Gel;

(iv)     paying sham consulting fees to doctors who agree to speak to sales representatives about how best to sell H.P. Acthar Gel; and

(v)   providing free prior authorization assistance services to physician practices.

-68-

### 1. *Questcor Bribes Physicians And Their Office Staff to Induce Them to Prescribe and Promote H.P. Acthar Gel.*

167.   Questcor faces a significant challenge in its effort to promote H.P. Acthar Gel for exacerbation of MS (its primary clinical use) because its primary competitor drug, Solu-Medrol, is cheaper, requires a shorter course of treatment and is the standard-of-care for treating exacerbations of MS. Questcor's response to this challenge has been to bribe physicians to prescribe and promote H.P. Acthar Gel instead of Solu-Medrol.

#### a.   Bribes to Office Staff

168.   Many of the physicians who treat patients with multiple sclerosis refuse to meet with pharmaceutical sales specialists. Indeed, approximately 75% of the physicians on Relator Strunck's Questcor-provided call list were "no see" physicians, meaning that they had policies that they would not speak with pharmaceutical sales representatives. One way in which Questcor has overcome this threshold obstacle is to bribe office staff to arrange such meetings.

169.   Beginning as early as initial sales training, Questcor has encouraged its sale specialists to provide gift cards to physicians' office staff in order to obtain access to the physicians themselves. Relator Strunck specifically received this instruction from his trainer, Roger Lovett, and from VP for Commercial Operations Eldon Mayer. The message was reinforced by his regional manager, Ken Miller, who (falsely) explained that this conduct was permitted by law because Questcor is a device manufacturer, and not a pharmaceutical company.

170. For example, Questcor, through its Regional Managers, encourages its sales specialists to provide gift cards for popular retailers (e.g., Dunkin Donuts, Starbucks) in exchange for setting up meetings with the physicians they serve. These gift cards also have the effect of rewarding the office staff for the time they will be expected to spend managing prior authorization and reimbursement requests for H.P. Acthar Gel.) Questcor routinely reimbursed Relator for these expenses, which he typically described as "gi certificates" and which Questcor coded as "FPE" in its reimbursement system.

171. Among the offices at which Relator Strunck was directed to, and did, use retail gift cards to facilitate the off-label promotion of H.P. Acthar Gel was the office of Drs. Alice Rusk and Walter Camp (Stamford/Greenwich, CT). Their practice treats predominantly Government Program beneficiaries, and Questcor's improper promotions induced Drs. Rusk and Camp to prescribe a five-day course of treatment with H.P. Acthar Gel for at least two patients who were suffering from acute exacerbations of MS.

172. Although Relator Strunck was encouraged by his Regional Manager to, and did, use relatively modest amount gift cards (up to $50) to incentivize physicians' office staff to assist him, other sales specialists were more lavish in the gifts they doled out. For example, when sales specialist Jessica Goguen was not "hitting her numbers" her Regional Manager at Questcor told her to ride with sales specialist Cory Prato (Brooklyn), who was considered to be a shining star within the company. Goguen took the advice, and observed Prato dole out $500 gift certificates

-70-

in order to incentivize practitioners and their staff. Goguen was appalled by this practice, complained about it to her Regional Manager, and said she would not replicate it herself. She received such a hostile reception to this statement that she voluntarily resigned her position with Questcor.

173.   As a practical matter, there is no limit on the number or dollar amount of gift cards that Questcor will permit its sales specialists to distribute. All requests for reimbursement of such expenses are routinely approved by Regional Managers with full knowledge of what the reimbursement is for, and its intended purpose. On the rare occasion when Relator Strunck's Regional Manager rejected a reimbursement request (perhaps 5% of all requests), the rejection was accompanied by an instruction on how to rephrase the request so that the expenses would be reimbursed dollar-for-dollar.

174.   Questcor tells its sales specialists that they are permitted to provide gift cards in exchange for access and approval because Questcor is a manufacturer of medical devices, not a pharmaceutical company.

### b.  Bribes to Physicians

175.   Questcor recognizes that, because of Solu-Medrol's therapeutic and financial advantages, getting in front of prescribing physicians is only half the promotional battle. Persuading them to switch from Solu-Medrol to H.P. Acthar Gel is not easy. Thus, the company encourages its sales specialists to incentivize physicians to make that switch by providing them with things of value.

176.   Questcor holds out Jessica Sukkanen, a sales specialist whose territory includes Nevada and Southern California, as a shining example of what the company considers to be the ideal sales specialist. Indeed, when Relator Strunck was hired by Questcor, his Regional Manager told him that he should call Ms. Sukkanen for advice.

177.   Relator Strunck called Ms. Sukkanen, who told him that she has had great success promoting a five-day course of treatment with H.P. Acthar Gel to the physicians in her territory. When Relator Strunck asked her how she was able to persuade physicians to make the switch from Solu-Medrol, she told him that she incentivize them by taking them on paid junkets in Las Vegas, entertaining them with lavish meals, and rewarding them with gift cards and spa treatments - all fully reimbursed by Questcor. She even bragged that she had particular success with physicians of Asian descent by "doing karaoke" with them, again, with Questcor's full knowledge and approval.

### c. Meals and Social Happy Hours

178.   Another way in which Questcor bribes physicians to switch from Solu-Medrol to H.P. Acthar Gel is by sponsoring meals and "happy hour" social gatherings for physicians and their staff. Although Questcor nominally requires that each such event include at least five "guests" in order to be reimbursed, in Relator Strunck's experience, the company imposes no limit on how much a sales specialist can spend in this fashion if doing so will "drive business."

179.    For example, Relator Strunck was encouraged to, and did, incentivize Dr. Nilay Shah, who practices in Mt. Kisko, NY and Jersey City, NJ, to switch from Solu-Medrol to a five day course of treatment with H.P. Acthar Gel in part by sponsoring a series of catered lunches for his office every other week. This, combined with other efforts described below, succeeded in persuading Dr. Shah to prescribe a five-day course of treatment with H.P. Acthar Gel for eight of his MS patients (although three refused to take delivery of the drug). As discussed infra, Relator Strunck also incentivized Dr. Shah by telling him that upon prescribing the drug for five patients, he could become a paid promotional speaker for N.P. Acthar Gel, which he did. Dr. Shah practice treats a significant number of Government Program (Medicare Part D) patients.

180.    Relator Strunck was encouraged to, and did, induce Drs Andrew Decker and Cordelia Schwarz (White Plains, NY) and Sarla Devi (Yonkers, NY) to prescribe a five-day course of treatment with H.P. Acthar Gel in lieu of Solu-Medrol. Questcor and Relator Strunck did this by treating the doctors, and Dr. Devi's husband, to a lavish dinner at the restaurant "42" (located in the Ritz-Carlton Westchester hotel) during which Dr. Mary Ann Picone (Teaneck, NJ) was paid to actively promote the five-day course of treatment with H.P. Acthar Gel. Following the dinner, Dr. Devi said that she would implement the five-day Brad Protocol for her patients, and she did. Drs, Schwarz and Decker declined. Relator Strunck believes that approximately 80% of Dr. Devi's patients are Medicare beneficiaries.

-73-

181. Drs. Schwarz and Decker practice with the West Med Medical Group. At his regional manager's direction, Relator Strunck sponsor several "happy hour" social events for their office in an attempt to persuade them to switch from Solu-Medrol to H.P. Acthar Gel. To their credit, Drs. Schwarz and Decker refused to make the switch because they were not comfortable with the lack of supporting data.

## 2. *Questcor Illegally Uses Research Money to Encourage Doctors to Prescribe and Promote H.P. Acthar Gel.*

182. Questcor routinely sponsors independent investigations conducted by physicians as a means by which to (i) provide a kickback to doctors who prescribe H.P. Acthar Gel, and (ii) market H.P. Acthar Gel for off-label use.

183. An example of this strategy is the situation of Dr. Brod *(author of the aforementioned of the Brod Protocol)* of the University of Texas. Questcor has paid Dr. Brod to conduct several investigational trials of H.P. Acthar Gel, including one to determine the efficacy of a five-day course of treatment. Questcor pays Dr. Brod $500 per patient for the trials, and subsequently has paid him handsomely to promote the results of his trials to physicians across the country. These trials are of dubious scientific value because they were neither placebo-controlled nor double-blind. None have been published in peer-reviewed journals, none have led to an application to expand the FDA approval for H.P. Acthar Gel, and none have demonstrated that H.P. Acthar Gel is any more efficacious than Solu-Medrol. These facts, notwithstanding, they studies, transformed Dr. Brod into a high volume

prescriber and a very highly compensated speaker for Questcor. In addition to all of the above, Brod is scheduled routinely for visits with Doctors and even accompanies sales representatives often on calls to Doctors, so much so, that he is hard schedule.

184. When Relator Strunck joined Questcor, his Regional Manager, Ken Miller, instructed him to jointly approach Dr. Mustafa Kahn (of Kingston Neurological Associates in Kingston, NY) with MSL Sagar Shah and offer to pay Dr. Kahn to conduct an "investigational trial" on H.P. Acthar Gel, in which Dr. Kahn would be paid per enrolled patient. Miller explained that this was a way to encourage Dr. Kahn to begin prescribing H.P. Acthar Gel, and that Dr. Kahn was considered to have the potential to be a high volume prescriber. Relator Strunck followed Miller's instructions, but was unable to arrange the meeting until June 8, 2011.

185. Another way in which Questcor sought to induce the physicians at Kingston Neurological Associates to prescribe the five-day Brod Protocol of H.P. Acthar Gel was by providing a $500 "grant" that Kingston requested in July 2011 to support a joint program between Kingston and Benedictine Hospital.

186. Dr, Sean Orr of Jacksonville, Florida is another high-volume prescriber that Questcor has rewarded with highly profitable investigational trials of dubious scientific value. These trials transformed the sales specialist assigned to Dr. Orr, Jason Ambrose, into one of Questcor's most successful - and highly compensated - sales specialists.

187.    Dr. Regina Berkovich of the University of Southern California is another high volume prescriber that Questcor has rewarded with highly profitable investigational trials of dubious scientific value. These trials helped to transform the sales specialist assigned to Dr. Berkovich, Jessica Sukkanen, into one of Questcor's most successful ·· and highly compensated · sales specialists.  As an example of the foregoing, Dr. Regina Berkovich presented a Questcor supported study at the 65th National AAN meeting held on March 10, 2013 in San Diego for use of Acthar in pulse therapy. [See Exhibit J attached hereto] Questcor Sales representatives and Key Opinion Leader sales liasons Joe Citkowski and Regional Manager John Stabile use this as a sales tools when soliciting Doctors, stating that Dr. Berkovich uses it for three days a month.

188.    Dr. Andrew Wu of San Francisco, California is another high-volume prescriber that·Questcor has rewarded with highly profitable investigational trials of dubious scientific value.

189.    As indicated above, Questcor induced Dr. Nilay Shah (Mt. Kisko, NY/Jersey City, NJ), to prescribe a five-day course of treatment with H.P. Acthar Gel for eight of his MS patients (although three refused to take delivery of the drug) by telling him that upon prescribing the drug for at least five patients, he could become a paid promotional speaker for H.P. Acthar Gel, which he did. Dr. Shah was given three speaking programs in a single day in July 2011, and he was paid $2,000 per program. These three presentations combined for a total of thirty minutes, plus additional time spent traveling among the offices. Thus, Dr, Shah was paid $6,000

-76-

for fewer than three hours of work. The real purpose of these payments were an inducement, which is clear when the payment is compared to the actual time spent.

### 3. *Questcor Illegally Uses Speaker Fees and Lavish Meals as a Means to Compensate Healthcare Providers Who Prescribe H.P. Acthar Gel.*

190.    Questcor knows that many healthcare providers are eager to supplement their income through drug-maker speaker programs. Thus, Questcor's speaker program is designed and intended both to induce off-label use of H.P. Acthar Gel, and to provide a financial inducement for the healthcare providers who do so.

191.    Questcor trains its sales specialists to identify potential speakers based on the volume of MS patients they treat. Physicians (and physician assistants and nurses) are ranked in one of ten deciles based on volume potential. In order to be selected as a qualified speaker, Questcor requires that the healthcare provider first write at least five prescriptions for H.P. Acthar Gel, thereby demonstrating his/her commitment to the drug (and providing a healthy profit for Questcor).

192.    Those who are selected for the paid speaker program are required to participate in paid speaker training that occurs by telephone. Thereafter, approved speakers can receive a fee of $2,000 per presentation, or $6,000 per day (assuming a maximum of three presentations per day). Questcor does not impose a cap on speaker fees, and some speakers, such as Dr. Brod and Dr. Berkovich are considered "national" speakers who can earn even more per presentation, The more vocal advocates can earn a substantial amount giving promotional talks for Questcor.

Relator Strunck estimates that Dr. Brod delivers about 100 paid presentations a year, and is paid accordingly.

193. Although Questcor pays its speakers at the very high end of the industry standard, its standard for what will qualify as a "speaker program" that is eligible for such payment is very low. As long as there are a mere three people in attendance · and they need not be physicians · the speaker is eligible for a full fee. Even spouses are permitted to attend.

194. That speaker fees really are a thinly-veiled effort to reward healthcare providers who prescribe H.P. Acthar Gel is confirmed by Relators experience that approximately 90% of all prescriptions for H.P. Acthar Gel are written by Questcor-approved speakers. Moreover, given that H.P. Acthar Gel has been FDA approved for more than fifty years, and given that virtually all of Questcor's promotion is focused on exacerbation of MS · an indication for which H.P. Acthar Gel was approved more than forty years ago · the need for any speaker programs on the subject is dubious at best. This tends to confirm that speaker fees are merely a quid pro quo for the decision to prescribe for the five day dosing regimen. Exhibit L is a list of 88 persons who are trained and approved by Questcor to speak on the use of H.P. Acthar Gel for the treatment of MS, and an additional 30 persons who are newly nominated and pending contracts and training.

195. While Questcor's threshold for who may qualify for the speaker program is quite low, and based solely on the healthcare provider's willingness to prescribe H.P. Acthar Gel, many healthcare providers decline the lucrative